RUSK v. The CHARLES MORGAN. See Case No. 2,618.

## Case No. 12,143.

### RUSK et al. v. The FREESTONE.

[2 Bond, 234.] [1]

District Court, S. D. Ohio. Oct. Term. 1868.

COLLISION—LOOKOUT—LIEN—PRIORITY—ASSIGNEE OF WAGES.

1. On all steamboats navigating the Western rivers there should be a competent and vigilant lookout.

[Cited in The Ancon, Case No. 348.]

2. The place of the lookout is on the forward part of the hurricane deck. where he can see approaching boats and other obstructions to navigation.

3. It is no excuse for the negligence of a lookout in failing to be in his proper place, that the upper deck was crowded with soldiers, and that there may have been difficulty in passing from one part of the boat to the other.

4. A lien by collision overrides and is paramount to all prior liens. including wages due.

5. The assignee of seamen's claims for wages has no maritime lien for those claims. and can have no standing in a court of admiralty.

[Cited in The R. W. Skillinger, Case No. 12,-181; The Napoleon, Id. 10,011; The Champion, Id. 2,583.]

[1] [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

[This was a libel by William J. Rusk and Andrew Byers, owners of the steamboat Belle Creole, against the steamboat Freestone, to recover damages sustained by collision.]

Mr. Huston, for libellant.

Lincoln, Smith & Warnock, for respondents.

OPINION OF THE COURT. The original libel, in the cases. before the court, was filed by the above-named Rusk and Byers, as owners of the steamboat Belle Creole, on December 17, 1861, in which they allege, as their cause of action, an injury sustained by their boat from a collision with the steamboat Freestone. Subsequently, separate libels were filed by the Eureka Insurance Company, the Central Insurance Company, and the Magnolia Insurance Company, to recover the sums alleged to be severally due for payments made by them respectively for injuries and damage sustained by the hull, machinery, and cargo of same steamboat Belle Creole, for which the owners held policies of insurance, and for which they claim that they have a maritime lien on the steamboat Freestone. There is also another libel, in the joint names of John Hopkins and numerous other claimants, to recover wages alleged to be due them from the owners of the Freestone, for which they assert they have a lien on said boat.

The Freestone was seized under process issued in the original case of Rusk and Byers. Subsequently, by an interlocutory decree, entered by consent of all the parties interested, the Freestone was sold at public sale by the marshal, and the proceeds—$3,400 —paid into the registry, where it yet remains. The libels are in the usual form. each containing the allegation that the collision was owing solely to the fault and mismanagement of the Freestone, and that she is responsible for the injury and damage resulting from it. This allegation is denied by the owners of that boat in their answers; and thus the issue is presented for the decision of this court.

There are some facts in the case not controverted. or so clearly proved as to be beyond controversy, which may be briefly stated as follows: On November 29, 1861, between four and five o'clock p. m., the Belle Creole left the port of Cincinnati destined for Pittsburg, with a cargo estimated at about three hundred and fifty tons, consisting of wheat in sacks, flour in barrels, bacon in casks, and some other articles. From Columbia, a few miles above Cincinnati, she made a crossing to the Kentucky shore, and was running up that side within seventy-five or fifty yards of that shore. The Freestone, coming down the river, with some two hundred soldiers on board as passengers, the two boats came into collision. the bow of the Freestone striking the larboard bow of the Belle Creole between her stern and

the forward ringbolt, crushing and breaking her timbers, penetrating inward some five or six feet, and making a triangular-shaped opening in her bow from eight to ten feet long at the upper side, and extending downward below the water line from four to five feet, making, as the witnesses term it, a clean cut, through which the water had free admittance. After the collision, and as soon as the boats separated, the Belle Creole was steered directly to the Kentucky shore, and sunk with her bow quartering up stream, within twenty or twenty-five feet of the shore, a few minutes after the collision. She was much injured in her hull and boiler deck, as also in her machinery. A part of the cargo was recovered, but in a greatly damaged condition, and sold at a heavy loss. The wreck was also sold, and raised and repaired by the purchasers at great expense.

This brief statement of facts not in dispute will suffice to present the general aspect of this case, and prepares the way for the consideration of the main question, namely, whether the Freestone is so far in fault as to be responsible for the injury sustained as a result of this collision. The case has been most strenuously contested by the parties interested, and great efforts have been made on both sides to obtain testimony to sustain their respective theories of the collision. It is not deemed necessary to present a critical analysis of the evidence adduced. As usual in cases of this kind, it is, in some material points, in direct conflict. There are, however, some leading facts in the case reasonably clear of doubt, and which must control its decision.

In the first place, there is no ground to doubt that at the time of the collision, the Belle Creole was from fifty to seventy-five yards of the Kentucky shore, and from two hundred and fifty to three hundred yards below the mouth of the Little Miami river. All the witnesses for the libellants, and some of those of the respondents, concur in this statement. The witnesses who locate the collision at or above the mouth of the Miami, have testified under a misapprehension of the facts, or have recklessly falsified the truth. The evidence is clear and positive that the wreck of the Creole lay not less than three hundred and fifty yards below the mouth of that river, and that from her weighty cargo, and the size of the opening in her bow, she could not have floated more than seventy-five yards after she was struck. It is, in my judgment, clear from the evidence, that when the pilot of the Belle Creole first saw the lights of the descending boat, she was hugging the Kentucky shore, more than five hundred yards below the mouth of the Miami. The Creole, then, was in her proper place when the first signal was given, which, it is admitted by the proctor for the respondents, came from the Creole.

There is positive evidence that the Creole's signal was one sound of her whistle. The pilot swears positively that this was the signal given. The professional competency of this pilot is not only not impeached, but it is proved that he has a high standing as a pilot of experience and skill. And there is nothing in the evidence to justify any inference unfavorable to the truthfulness of his sworn statements. He is, moreover, directly corroborated on the point in question by the engineer on duty at the time the signal was given, and when the collision occurred, and also by the mate. With all the means of knowing what was done on the boat on which he was serving, these witnesses swear positively to the single signal from the Creole.

I have carefully considered the evidence by the respondents to sustain the opposite conclusion. But it is unsatisfactory and inconclusive. Even the pilot on the Freestone at the wheel at the time, is not positive as to the first signal given by the Belle Creole. In his examination in chief, he states it, not as a fact of positive knowledge and recollection, that the Belle Creole gave the double signal, but that such was his impression and belief. On his cross-examination he says he could not say whether there was one whistle or two from the Creole. And there is a fact in proof of great significance on this point, namely, that the master of the Freestone, who was in the pilot-house at the time, expressed to the pilot his doubt whether there was one or two sounds of the whistle from the Creole. The pilot, however, though himself in doubt, said he would reply by two, and they were given accordingly. And it is worthy of notice that several other witnesses for the respondents, as to the first signal from the Creole, are very guarded in their statements on the point in question, as if not clear in their own minds. It is true the depositions of six or seven soldiers on board the Freestone at the time have been taken, under the act of congress, while they were in camp in Kentucky, long after the transaction occurred concerning which they testify, who swear very nearly in the same words, that the first signal from the Creole was two sounds of her whistle, and that the response from the Freestone was the same. For obvious reasons but little weight can be given to the statements of these witnesses. Their depositions were taken ex parte under the act of congress, at a military post, at a distant point in Kentucky, where these soldiers were in the service. It was not possible under the circumstances for the libellants to re-examine them, and to test the accuracy of their statements. This fact alone would lead the court to regard their evidence with extreme caution. In addition, I may add that there is not a reasonable probability that these soldiers, under the circumstances existing on the boat, would have noticed the signals which passed, or recall them with any thing like accuracy

months after the occurrence. And I may add here, that the evidence of all the witnesses on the Freestone is less reliable than it would have been under a different state of things. The boat was excessively crowded by the soldier passengers, and there was much excitement, noise, and confusion on board. She was within a short distance of Cincinnati, and the officers and soldiers were in busy preparation for leaving the boat there. It is natural that all on board, even those officially connected with the navigation of the boat, should be affected more or less by these circumstances, and be less capable of noticing and remembering what occurred. This inference is strengthened by the fact before adverted to, that the officers of the Freestone, who have been sworn in the case, state with hesitancy and doubt as to the first signal from the Creole.

One phase of this case is obvious at the first glance, namely, that the collision in question was not the result of inevitable accident or necessity. There was fault somewhere, and there must be consequent liability for the result. The river was at a high stage, there being at least twelve feet of water in the channels. The navigable width of the river at the point of collision was from 300 to 350 yards, so that there was no conceivable necessity, that the boats should have come together in passing. Where, then, rests the blame of the collision? It is clearly not a case of mutual fault, calling for a division of damages. The Creole was in the proper place of an ascending boat, gave the proper signal, and steered accordingly. It moreover appears that as soon as her pilot was aware that the Freestone was not navigating according to the signal, and that there was danger of a collision, the order was given to stop and back, and she had actually backed some eighty feet, when struck by the descending boat. If the signal of the Creole was for the Kentucky side, the Freestone was wrong in signaling for the same side, and attempting to run inside of the Creole's line of navigation. The evidence is clear, that the Freestone was at the time pointed toward the Kentucky shore, and struck the Creole at an angle of thirty-five or forty degrees. If the Creole's first signal was not understood, the pilot of the other boat erred in not promptly taking the proper means to have the misunderstanding corrected. She did give a second signal of two whistles, but it was after the lapse of five minutes from the first signal, and when the boats were so near that a collision was unavoidable. Moreover, the Freestone erred in not giving the order to stop and back in proper time. Such an order was given, but it was too late; and all the facts show, that although the engine had been reversed, the boat had not actually backed when she struck the Creole. It is not to be supposed, from the force with which she struck the Creole, and the serious injury which the blow inflicted, that there was any

material decrease in the forward motion of the Freestone.

There was another obvious fault on the part of the Freestone, which, in the absence of any fault in the management of the other boat, would be sufficient to charge her with the consequences of the collision. It has been often decided by this court, and by other courts of high authority, that there should be a competent and vigilant lookout on all steamboats navigating the Western rivers. On the Western rivers, this duty devolves on the master, when on watch. The evidence is very clear in this case, that the night was very dark, and all the circumstances required a constant and vigilant lookout. The master, however, was in the pilot-house, until the second signal was given by the Freestone, when the boats were so near that a collision was inevitable. Now his place was on the forward part of the hurricane deck, where he could see approaching boats or other obstructions to navigation. His failure to be in the proper place of the lookout was most probably the cause of this collision. If he had been there, attending strictly to his duty, and watching the course of the ascending boat, the collision would have been avoided. It is no excuse for this negligence that the upper deck was crowded with soldiers, and that there was difficulty in passing from one part of the boat to the other. No reason is given or attempted why he was not from the first in his proper place on the forward part of the hurricane deck.

In any aspect of this case, the facts point to the conclusion that the loss and damages resulting from this collision are chargeable to, and must be laid upon the Freestone as solely in fault, and a decree must be entered accordingly. But it is impossible, as this case is now before the court, to enter a final decree apportioning specifically the proceeds in the registry to the different claimants. Under any allowance that can be made to them, it seems clear the amount will exceed the sum in the registry, and that there must be a pro rata distribution among the claimants. But the court is furnished with no data on which this can be made. In relation to some of the claims, it is at least doubtful, on principle, whether they can be legally allowed, if proved by competent evidence. For example, in the original libel of Rusk and Byers, as owners of the Creole, a charge of upward of $1,000 is made for the loss of the freight which would have been earned if the trip had not been broken up by the injury to the boat. Without having looked into the authorities as to the validity of a claim on this basis, I suppose it to be unquestionable that the freight list must at least be subject to deductions for the expenses of carrying the cargo to the port of destination. The owners also insert a claim of $4,300, as the difference in the value of the Creole before the collision and after she was raised and repaired. Without deciding whether this claim

can be allowed in whole or in part, it is certain it can not be allowed to any extent, unless sustained by proof. And in regard to both the charges adverted to, I have not noticed among the papers any satisfactory evidence. And in reference to the claims of the insurance companies, I have found no evidence of the net sums paid by them on account of their policies.

I may remark, also, in reference to the intervening claims of John Hawkins and many others, set up in their joint libel, that there is no evidence before the court on which their claims can be definitely adjusted and allowed. They are evidenced by due-bills given by the clerk of the Freestone after the collision, for wages due. But some of these due-bills include wages earned prior to the collision. Now a lien by collision overrides and is paramount to all prior liens, including even wages due. So that these parties can only recover the proportion of their claims accruing for wages earned after the collision. As the fund in the registry will not discharge all the claims having a priority of lien, it is not necessary to inquire what rank of privilege or lien the claims for wages earned before the collision would occupy. It is certain they must be ranked as of an inferior order of liens to those for wages earned after the collision. It also appears, in reference to some of the claims set up in the last-named libel in the names of the hands or seamen by whom the wages were earned, that they have been paid by third parties, and the claims virtually assigned to those for whose benefit the libel has been filed. Now, these assignees have no maritime liens for those claims, and can have no standing in a court of admiralty. These views are thrown out for the purpose of showing the necessity of a reference of all the claims asserted in the various libels to a commissioner, to the end that the necessary proofs may be presented, and that the opportunity may be afforded of discussing before the court the principles on which their allowance is asked for. Unless, therefore, the proctors for the different parties in interest can agree on the sums to be decreed to each of the claimants, and the principles on which the fund in the registry is to be apportioned, the court will direct a reference of all the cases to a commissioner, to inquire and report on the matters indicated.

To avoid any unnecessary embarrassment, if the reference is made as suggested, it may be well, perhaps, now to pass on an objection made by the proctor representing the owners of the Creole, in the argument of this case, to all the various claims set up in the libel of Hopkins and others. The point of that objection was, that there was no evidence that these claimants had given their consent to, or authority for, the presentation of their claims in this proceeding, or had in any way authorized the filing of this libel. It would seem, as to the larger part of these claims, no such express authority is proved. The claims are very numerous, and many of them for very small amounts. They were placed in the hands of the proctor by the clerk of the boat for collection; and he understood that it was the wish of the claimants that they should be prosecuted in this proceeding. None of the claimants have signified any dissent to this course. The claims, as proved by the due-bills, are probably just and ought to be paid, so far as the claimants have a priority of lien. I am unwilling, under such circumstances, to turn them out of court, and leave them without remedy. In so far, then, as these claims are prosecuted in the names and for the benefit of the original claimants, for wages earned after the collision, they will be allowed their pro rata share out of the fund in court. This pro rata, however, can not now be determined for the reasons already stated, and these claims will all be referred to the commissioner for investigation as to the points indicated.